Slip Op. 13-69

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| SINCE HARDWARE (GUANGZHOU) CO., LTD., | |
| Plaintiff, | |
| v. | Before: Leo M. Gordon, Judge |
| | Consol. Court No. 11-00106 |
| UNITED STATES, | |
| Defendant. | |

**OPINION and ORDER**

[Final results of administrative review sustained in part and remanded in part.]

Dated: May 30, 2013

William E. Perry and Emily Lawson, Dorsey & Whitney LLP of Seattle, Washington for Plaintiff Since Hardware (Guangzhou) Co., Ltd.

Gregory S. Menegaz, J. Kevin Horgan, and John J. Kenkel, DeKieffer & Horgan of Washington, DC for Plaintiff-Intervenor Foshan Shunde.

Carrie A. Dunsmore, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice for Defendant United States.  With her on the brief were Stuart F. Delery, Principal Deputy Assistant Attorney General, Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director.  Of counsel on the brief was Thomas M. Beline, Office of the Chief Counsel for Import Administration of Washington, DC.

Frederick L. Ikenson, Peggy A. Clarke, and Larry Hampel, Blank Rome LLP of Washington, DC for Defendant-Intervenor Home Products International, Inc.

Gordon, Judge: This consolidated action involves the U.S. Department of Commerce's ("Commerce") fifth administrative review of the antidumping duty order covering Floor-Standing, Metal-Top Ironing Tables from China.  See Floor-Standing, Metal-Top Ironing Tables and Certain Parts Thereof from the People's Republic of China, 76 Fed. Reg. 15,297 (Dep't of Commerce Mar. 21, 2011) (final results admin.

review), as amended by 76 Fed. Reg. 23,543 (Dep't of Commerce Apr. 27, 2011)

(amended final results admin. review) (collectively, "Final Results"); see also Issues and

Decision Memorandum for Ironing Tables from China, A-570-888 (March 22, 2011),

available at http://ia.ita.doc.gov/frn/summary/PRC/2011-6558-1.pdf (last visited this

date) ("Decision Memorandum").     Before the court are the Final Results of

Redetermination, ECF No. 85 ("Remand Results") filed by Commerce pursuant to Since

Hardware (Guangzhou) Co. v. United States, Consol. Court No. 11-106, ECF No. 81

(Aug. 14, 2012) ("Since Hardware") (order remanding to Commerce).   The court has

jurisdiction pursuant to Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended,

19 U.S.C. § 1516a(a)(2)(B)(iii) (2006),[1] and 28 U.S.C. § 1581(c) (2006).

Plaintiffs Since Hardware (Guangzhou) Co., Ltd. ("Since Hardware") and Foshan

Shunde Yongjian Housewares & Hardwares Co., Ltd. ("Foshan Shunde") both

challenge Commerce's financial statement selection; Foshan Shunde challenges

Commerce's brokerage and handling surrogate valuation; and Since Hardware

challenges Commerce's cotton fabric surrogate valuation and labor wage rate surrogate

valuation.[2]   See Since Hardware Comments to Remand Results, ECF No. 90

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2006 edition.

[2] Since Hardware also attempted to challenge Commerce's brokerage and handling ("B&H") valuation, but the court had to deem the issue waived for failure to adequately brief the argument.   Since Hardware at 7; see also Home Prods. Int'l, Inc. v. United States, No. 11-00104 (Jan. 3, 2012), ECF No. 62 (order waiving challenge to B&H

(footnote continued)

("SH Remand Br."); Foshan Shunde Comments to Remand Results, ECF No. 89 ("FS Remand Br.").  The court sustains Commerce's labor wage rate valuation and cotton fabric valuation, but remands the issues of financial statements, and brokerage and handling to Commerce for further consideration.

## I. Standard of Review

When reviewing Commerce's antidumping determinations under 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c), the U.S. Court of International Trade sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole.  Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006).  Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).

---

calculation), as amended, ECF No. 63; Home Prods Int'l, Inc. v. United States, 36 CIT ___, ___, 837 F. Supp. 2d 1294, 1300-1302 (2012); opinion after remand, Home Prods. Int'l, Inc. v. United States, 36 CIT ___, 853 F. Supp. 2d 1257 (2012).

Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review.   3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d. ed. 2013).   Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record."   Edward D. Re, Bernard J. Babb, and Susan M. Koplin, 8 West's Fed. Forms, National Courts § 13342 (2d ed. 2013).

Separately, the two-step framework provided in Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-45 (1984), governs judicial review of Commerce's interpretation of the antidumping statute.   See United States v. Eurodif S.A., 555 U.S. 305, 316 (2009) (Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous.").

## II. Discussion

### A.  Financial Statement Selection

Commerce's selection of financial statements to calculate the financial ratios for respondents' margins is an oft-litigated issue in non-market economy antidumping cases.   Commerce is guided by a general regulatory preference for publicly available, non-proprietary information.   19 C.F.R. § 351.408(c)(1), (4) (2009).   Beyond that, Commerce generally considers the quality, specificity, and contemporaneity of the available financial statements.   See Fresh Garlic from the People's Republic of China,

67 Fed. Reg. 72,139 (Dep't of Commerce Dec. 4, 2002) (final results new shipper review).

During the administrative review, Commerce had a choice from among four Indian financial statements: '06-'07 Infiniti Modules Private Ltd. ("Infiniti Modules"); '08-'09 Omax Autos Ltd. ("Omax"); and '07-'08 and '08-'09 Maximaa Systems Ltd. ("Maximaa").  In the Final Results Commerce chose the '06-'07 Infiniti Modules' financial statements alone as the best available information from which to calculate the financial ratios.  Foshan Shunde and Since Hardware challenged this decision, arguing that the statements were not publicly available and that Omax's and Maximaa's financial statements represented the best available information to calculate the financial ratios. Since Hardware Mot. for J. upon the Agency R., ECF No. 43 (SH 56.2 Br."); Foshan Shunde Mot. for J. upon the Agency R., ECF No. 44 (FS 56.2 Br.").   In its initial consideration of the issue, the court agreed that Commerce's choice may not have been reasonable and remanded for Commerce to "reconsider[] the issue of the public availability of the Infiniti Modules financial statement, . . . [and to] review and reconsider whether the more contemporaneous statements of Omax or Maximaa might be useful additional data points, either in place of, or in addition to, Infiniti Modules."  Since Hardware at 6.  On remand Commerce again solely selected the '06-'07 Infiniti Modules' financial statements and found them to be publicly available.  See Remand Results at 7,15.

### 1. Public Availability

When first reviewing the issue of the public availability of the '06-'07 Infiniti Modules' financial statements, the court could not sustain Commerce's determination as reasonable.  Since Hardware at 6.  Although Commerce found that the statements were available through the Indian Ministry of Corporate Affairs' ("MCA") website, Decision Memorandum at 10, there was more than a "fair amount of record information demonstrating that the Infiniti Modules financial statements may not have been publicly available[,]" as evidenced by Since Hardware and Foshan Shunde's unsuccessful attempts to obtain the financial statements or other Infiniti Modules' financial information.  Since Hardware at 4.

On remand Commerce acknowledges that it erred in the Final Results when it concluded that the Infiniti Modules' financial statements were available through the MCA website; they are not.  Remand Results at 7.  Commerce nevertheless clarifies that it still believes they are publicly available.  Id. at 29.  In the Remand Results Commerce reasons that the Infiniti Modules' financial statements are publicly available because they were used in a prior administrative review and available on the public administrative record of that review are publicly available.  Id. at 29.  Commerce explains that Commerce and all interested parties have significant experience with Infiniti Modules as a surrogate company.  Id. at 5-6.  In each of the four prior administrative reviews, Commerce calculated financial ratios using a single year of Infiniti Modules' financial statements.  See Floor-Standing, Metal-Top Ironing Tables and Certain Parts Thereof from the People's Republic of China, 72 Fed. Reg. 13,239

(Dep't of Commerce Mar. 21, 2007) (final results 1st admin. review) (selected Infiniti

Modules' '04-'05 statement); Floor-Standing, Metal-Top Ironing Tables and Certain

Parts Thereof from the People's Republic of China, 73 Fed. Reg. 14,437 (Dep't of

Commerce Mar. 18, 2008) (final results 2nd admin. review) (selected Infiniti Modules'

'04-'05 statement); Floor-Standing, Metal-Top Ironing Tables and Certain Parts Thereof

from the People's Republic of China, 74 Fed. Reg. 11,085 (Dep't of Commerce Mar. 16,

2009) (final results 3rd admin. review) (selected Infiniti Modules' '06-'07 statement);

Floor-Standing, Metal-Top Ironing Tables and Certain Parts Thereof from the People's

Republic of China, 75 Fed. Reg. 55,759 (Sept. 14, 2010) (prelim. results 4th admin.

review) (selected Infiniti Modules' '05-'06 statement).   In prior administrative reviews

both Since Hardware and Foshan Shunde accepted Infiniti Modules' financial

statements as publicly available and argued about the specific substantive application of

the financial statements:

> Specifically, Infiniti Modules' 2006-2007 financial statements were
> obtained by Petitioner and placed on the record of the third administrative
> review along with the 2005-2006 financial statements of Infiniti Modules.
> [Commerce] used the 2006-2007 financial statements of Infiniti Modules in
> the calculations set forth in the final results of the third administrative
> review.  More importantly, Since Hardware acknowledged the existence of
> and was given the opportunity to comment on both Infiniti Modules' 2005-
> 2006 and Infiniti Modules' 2006-2007 financial statements in that review.
> Specifically, during that review, Since Hardware asserted that regardless
> of whether [Commerce] selected the 2005-2006 financial statements of
> Infiniti Modules or the 2006-2007 financial statements of Infiniti Modules,
> [Commerce] should make certain adjustments to the financial ratios
> derived from those financial statements.   Similarly, Foshan Shunde
> engaged in argument over certain aspects of using Infiniti's financial
> statements in the fourth administrative review, though it did not dispute
> that the information was publicly available.

Remand Results at 5-6 (citations omitted).   Noting that its regulatory preference for publicly available information addresses "the concern that a lack of transparency about the source of the data could lead to proposed data sources that lack integrity or reliability," Commerce found that nothing had "transpired to undermine the integrity or reliability" of the '06-'07 Infiniti Modules' financial statements.  Id. at 6.

This though is not really a determination of "public availability" made against measurable objective criteria.  It is instead a determination that the Infiniti Modules' data remains among the best available information because of its reliability (notwithstanding that it may not be publicly available).  The court understands Commerce's desire to use information with which it is familiar from a surrogate company that it knows well.   It makes good, practical, efficient sense.  The '06-'07 Infiniti Modules' financial statements were apparently obtained directly from the company by petitioner, Home Products International, Inc. ("HPI"), in the third administrative review.   The public availability of that document was not challenged.  Financial statements from Infiniti Modules were also used in the fourth administrative review, and again the public availability of that data was not challenged.   In both instances respondents accepted the data and made substantive arguments about its proper use.  Commerce and the interested parties have invested significant time and energy over the course of the prior reviews vetting and refining the Infiniti Modules' financial statements for use in the financial ratio calculations.  The court fully understands Commerce's reluctance to abandon otherwise reliable data on a technicality that it has become publicly unavailable (or perhaps never was when measured against objective criteria).

The court, though, cannot sustain Commerce's determination that these financial statements are publicly available.  In the Remand Results Commerce cites to Catfish Farmers of Am. v. United States, 33 CIT ___, ___, 641 F. Supp. 2d 1362, 1377 (2009), as an example of "the standard for public availability established in our practice." Remand Results at 29.  One searches Catfish Farmers in vain for an explanation of the "standard for public availability established in [Commerce's] practice."  Remand Results at 29.  That explanation does not appear in Catfish Farmers because it did not involve Commerce's administrative practice for determining public availability.  Instead, Catfish Farmers involved a challenge to Commerce's use of a proprietary auditors' report to supplement a publicly available financial statement.  Catfish Farmers, 33 CIT at ___, 641 F. Supp. 2d at 1377.  Unlike here, Commerce did not determine that the proprietary auditors' report was publicly available.  Commerce, instead reasoned that because everyone had fair and open access to it during the proceeding, it was appropriate to supplement an otherwise publicly available financial statement as among the best available information.  Id.  The court, in turn, sustained as reasonable Commerce's use of the non-public, confidential, auditors' report to supplement a publicly available financial statement.  Id.

Further, Catfish Farmers does not identify or explain Commerce's standards or criteria for public availability.  Instead, it more modestly demonstrates that Commerce's regulatory preference for public availability is not absolute, offering an instance in which Commerce's use of proprietary surrogate information was reasonable.  Catfish Farmers does not provide support for Commerce's conclusion that the Infiniti Modules' financial

statements are publicly available.   Catfish Farmers would instead appear to lend

support for the conclusion that although the '06-'07 financial statements are no longer

publicly available, they may still merit consideration as among the best available

information to calculate surrogate financial ratios because all parties had full and fair

access to otherwise reliable data.

As for the missing public availability criteria necessary to evaluate Commerce's

decision here, Foshan Shunde directs the court to another administrative proceeding,

contemporaneous with the Remand Results, where Commerce applied what appears to

be fairly rigorous standards for public availability.   See Yantai Xinke Steel Structure Co.

v. United States, Court No. 10-00240, Final Results of Redetermination Pursuant to

Court Remand, ECF No. 83 at 18-23 ("Steel Grating Remand Results"); see also

Certain Steel Grating from the People's Republic of China, 75 Fed. Reg. 32,366 (Dep't

of Commerce June 8, 2010) (final LTFV determ.).   In that proceeding Commerce

> sought clarification by issuing a supplemental questionnaire. . . . In this
> supplemental questionnaire, the Department requested that Petitioners
> provide a detailed step-by-step explanation of how they obtained
> Greatweld's 2008-09 financial statements, and that the steps provided
> should be of sufficient detail so that any party would be able to replicate
> these steps to acquire Greatweld's 2008-09 financial statements.  If such
> a step-by-step explanation could not be provided, the Department
> requested that Petitioners provide a detailed explanation of why they could
> not provide such information.   In addition, the Department also asked
> Petitioners to provide a detailed explanation as to the reason they
> believed Greatweld's 2008-09 financial statements were properly
> described as publicly available and, in providing their response, to indicate
> if Greatweld was required under Indian law to publicly file its 2008-09
> financial statements with any governmental authority.

Steel Grating Remand Results at 19-20.   Petitioners there provided the step-by-step

process of obtaining the "1) annual return; 2) balance sheet; 3) schedules; 4) auditor's

report; 5) director's report; and 6) notice," but did not provide the step-by-step process

of receiving the income statements.   Commerce determined Greatweld's financial

statements were not publicly available "[b]ecause the other interested parties to the

proceeding, as well as the Department itself, do not know the steps necessary to

acquire Greatweld's 2008-09 income statement, and, therefore, could not acquire that

data themselves . . . ."  Id. at 22.

        In contrast, Commerce here was satisfied that Infiniti Modules' statements were

publicly available because "Petitioner was able to get them directly from the company

simply by requesting them," Remand Results at 7, even though respondents were

apparently unsuccessful with similar requests.   Under the standards Commerce

enunciated in the Steel Grating Remand Results, respondents' inability to obtain the

data from the same source and in the same manner does seem to establish that Infiniti

Modules' statements are now publicly unavailable.   In the Remand Results Commerce

casts a skeptical eye on respondents' efforts to obtain the data from Infiniti Modules,

noting that respondents never specifically requested the '06-'07 data.  Id. at 6-7.  The

court was somewhat surprised by this interpretation of the record.  Although it may be

technically correct, the court was under the impression that the record made clear that

respondents had made a good faith effort to obtain general financial information from

Infiniti Modules (including more contemporaneous financial statements), but were

completely rebuffed, which then instigated their arguments about public availability.

The court will remand the issue of public availability for Commerce to reconcile its approach here with the <u>Steel Grating Remand Results</u>, as well as to reconsider its determination in light of the court's explanation of <u>Catfish Farmers</u>.  Commerce's determination that Infiniti Modules financial statements are publicly available remains unreasonable (unsupported by substantial evidence), and therefore cannot be sustained.

## 2. Other Financial Statements

In <u>Since Hardware</u> the court also remanded for Commerce to "review and reconsider whether the more contemporaneous statements of Omax or Maximaa might be useful additional points, either in place of, or in addition to, Infinit[i] Modules" and to "explain its choices in this administrative review against the choices made in <u>Folding Metal Tables and Chairs</u> . . . ."  <u>Since Hardware</u> at 6.  On remand Commerce again selected the '06-'07 Infiniti Modules' financial statements.  Since Hardware and Foshan Shunde argue that Commerce's selection was unreasonable and that it should have selected Omax or Maximaa.  As previously discussed, Infiniti Modules' data has certain advantages.  It has been used in every review under the order, and Commerce and the parties know it well.  The '06-'07 Infiniti Modules' financial statements, however, are less contemporaneous than the other choices, and have this nagging problem with public availability.  The court, for its part, remains unconvinced that Commerce's sole selection of the '06-'07 Infiniti Modules' financial statements alone is a reasonable choice on this administrative record.

### a. Maximaa

Compared to the '06-'07 Infiniti Modules financial statements, the '07-'08 Maximaa financial statements are more contemporaneous, and the '08-'09 Maximaa financial statements cover the exact period of review.  Unlike Infiniti Modules' financial statements, Maximaa's public availability is not in dispute.  Commerce, nevertheless, continues to reject Maximaa's financial statements for the following reasons:

> We . . . dispute Foshan Shunde's assertion that Maximaa's financial statements represent the best available information. Foshan Shunde argues that the Department's selection of Maximaa's financial statements in Folding Metal Tables and Chairs undercuts the rejection of Maximaa's 2007-2008 financial statements in the instant proceeding.  However, in the proceeding at issue in this remand, **the Department declined to use the 2008 and 2009 financial statements of Maximaa based on record evidence that was submitted by interested parties on the record of this case, not the record of the case Foshan cites**.  The record evidence in this proceeding is separate and distinct from the information that comprised the record in Folding Metal Tables and Chairs and relates to a different product.  Necessarily, our comments about the nature of financial statements in that case were made in the context of comparing them to folding metal tables and chairs, not ironing tables.  In Folding Metal Tables and Chairs, we based our selection of Maximaa on the fact that, **based on the evidence in that proceeding, "a greater proportion of Maximaa's production appears to consist of comparable merchandise (i.e., metal furniture)," and "because it has a similar production process to that of the respondent."  The record in this case does not support the same conclusions.  Rather, Maximaa's business activities and production processes do not resemble that of respondent in this case and with respect to this product.** . . .[T]he Department's review of the information submitted by Petitioner concerning Maximaa's financial statements indicated that **Maximaa had increasingly become an assembler rather than a manufacturer of the merchandise.  Thus, notwithstanding the conclusion reached in Folding Tables and Chairs that Maximaa was an integrated producer of steel furniture**, we continue to maintain that facts on the record in this case demonstrate that the use of Maximaa's financial statements inappropriate in this proceeding.

Remand Results at 12-13 (citations omitted) (emphasis added).

Commerce fails to reasonably distinguish its financial statement selection here from its financial statement selection in Folding Metal Tables and Chairs from the People's Republic of China, 74 Fed. Reg. 68,568 (Dep't of Commerce Dec. 28, 2009) (final results admin. review) ("Folding Metal Tables and Chairs"); see also Issues and Decision Memorandum for Folding Metal Tables and Chairs from China, A-570-868 (Dec. 18, 2009), available at http://ia.ita.doc.gov/frn/summary/prc/E9-30695-1.pdf (last visited this date) ("FMTC Decision Memorandum").  Folding Metal Tables and Chairs involved merchandise similar to metal ironing boards and a choice among similar financial statements, Maximaa's '07-'08 and Infiniti Modules' '06-'07.  In that review, Commerce selected the Maximaa financial statement because it found that Maximaa produced a greater proportion of comparable merchandise--metal furniture--than Infiniti Modules, and because Maximaa was an integrated producer while Infiniti was an assembler.  FMTC Decision Memorandum at 4-5.

Commerce distinguished Folding Metal Tables and Chairs by explaining that, in this review, Maximaa had "increasingly become an assembler."  Remand Results at 13. Commerce rejected Maximaa's financial statement because of this critical finding.  Id. However, Infiniti Modules was "evermore a 100% assembler."  FS Remand Br. at 10. Therefore, the court does not understand the basis for rejecting Maximaa's financial statements because it was becoming an assembler, while accepting the financial statements of Infiniti Modules, who was an assembler.  The simple fact is that both were

assemblers.   Commerce's distinction appears to be one without a difference, and is accordingly unreasonable.

Turning to Commerce's remaining criteria for selecting the best available information, Maximaa remains more contemporaneous, has more comparable metal merchandise, and its public availability is not in dispute.   On this administrative record, it is difficult to imagine a reasonable mind concluding that Maximaa's financial statement is not at least as useful, if not better, than the Infiniti Modules data.   Further, Commerce has a "preference . . . to use more than one financial statement where more than one representative financial statement is available."   Remand Results at 14.   The court, therefore, remands this issue to Commerce to reconsider its financial statement selection.

### b. Omax

Since Hardware and Foshan Shunde argue that Commerce also unreasonably excluded the '08-'09 Omax financial statements.   In selecting financial statements, Commerce is driven by a statutory preference for selecting financial statements from producers of comparable merchandise.   19 U.S.C. § 1677b(c)(4)(B); see also 19 C.F.R. § 351.408(c)(4) ("For manufacturing overhead, general expenses, and profit, the Secretary normally will use non-proprietary information gathered from producers of identical or comparable merchandise in the surrogate country.").   In the final results Commerce declined to use Omax's financial statements because it determined that Omax was primarily an auto producer and therefore not an appropriate surrogate.  Final Results; see Decision Memorandum at 10-11.   Respondents challenged Commerce's

findings and argued that they had supplied evidence of Omax's production of home furnishings.  The court, therefore, directed Commerce to address the evidence of Omax as a manufacturer and supplier of ironing tables.  <u>Since Hardware</u> at 6.

On remand, Commerce determined that Omax was not a producer of ironing tables:

> [T]here is no record evidence that suggests Omax sold ironing tables to either Ikea or Polder during either the POR or the period covered by Omax's 2008-2009 annual report.   We thus conclude that while Omax may have been in a position to supply ironing tables to Polder subsequent to the end of the POR, there is insufficient evidence to conclude that Omax was a producer of ironing tables during the POR.

<u>Remand Results</u> at 12.  This finding is unreasonable on an administrative record in which the Omax '08-'09 financial statements actually contain a picture of an ironing table.  <u>Id.</u> at 31.  Although Commerce tries to explain the picture away, <u>id.</u> at 31, the court is not persuaded that a company not producing ironing tables would include a picture of an ironing table in its financial statements as a representative product. Additionally, Polder, Inc., a company that imported ironing tables from Omax, stated in a letter that Omax "has supplied global behemoth Ikea with ironing tables and other steel housewares for the <u>last two years</u>."  Since Hardware SV Submission, PD 98, App. 1 at 1-2 (emphasis added).[3]  Because Polder's letter was dated, October 15, 2010, the "last two years" references October 2008 through October 2010.  <u>Id.</u>  This period overlaps this 2008-2009 administrative review.  Therefore, Commerce unreasonably concluded that "there is no record evidence that suggests Omax sold ironing tables to either Ikea

_____

[3] "PD" refers to a document in the public administrative record.

or Polder during the POR or the period covered by Omax's 2008-2009 annual report."

Remand Results at 12.

This error though is ultimately harmless because Commerce's overall decision to

exclude the Omax financial statements remains reasonable.  The administrative record

supports Commerce's determination that Omax is not a suitable surrogate because it is

primarily an auto producer:

> . . . [T]he record in this case establishes that during the period of review (POR), Omax's principle business comprised automotive products. Ironing tables constituted, at most, a very small portion of Omax's business during Omax's 2008-2009 financial reporting period.
>
> As a fundamental matter, Omax's 2008-2009 annual report establishes that during the 2008-2009 fiscal reporting period, Omax was principally a manufacturer of automobile parts. First, we note that Omax's official name is "**Omax Autos Limited**."  More importantly, we note that at page 13 of its financial statements, Omax lists 29 of its customers.  **Of those 29 customers, only one customer** (Ikea) seems to be involved in the business that Omax describes as "home furnishings."  The rest of the customers listed by Omax in that section of the report appear to be involved in the automotive business based upon a simple examination of the company names.  The importance of the automotive business to Omax is further highlighted in the account from Jatender Mehta, the Managing Director of Omax, which can be found in Omax's 2008-2009 annual report . . . .  In that account, Mr. Mehta discusses Omax's financial performance during the fiscal year.  In discussing the challenges that Omax faced during the 2008-2009 fiscal reporting period, Mr. Mehta cites to a decline from "**World Giants like GM, Chrysler and Ford." Mr. Mahta**[sic] **also notes a downturn that was experienced by Toyota.** While Mr. Mehta indicates elsewhere in this account that Omax intends to expand the company's "product profile to Home Furnishings, Commercial Vehicles and the Indian Railway," Mr. Mehta merely indicates that "[I]nvestments for creating manufacturing facilities have been earmarked." However, Omax's "foray" into the home furnishings business, is primarily described as a business segment from which Omax expects to derive future, rather than current, business. Mr. Mehta discusses no specific sales volume for "home furnishings" during the POR.  Additionally, Mr. Mehta indicates that;

> . . . the company has made a foray into the Home Furnishings segment. The strategy has been to tie up with the biggest international brand—Ikea. This would include the desired level of quality, delivery and cost awareness within the Company. The company has started exports of various items under the division. We are putting up a new 10 Acre plant facility at Bawai Haryana. This plant will be operational in the 3rd quarter of FY 09-10.

> From our review of the customers identified by Omax, in its 2008-2009 Annual Report, and the account of Omax's business that is set forth by Mr. Mehta, we continue to conclude that **Omax's primary business during the period captured by its 2008-2009 financial statements was the production of automotive products.**
>
> ***
>
> Because automotive products are less similar to ironing tables than is furniture, we conclude that data from Infiniti Modules represents a higher quality of data within the meaning of section 773(c)(l) of the Act.

Id. at 10-12 (emphasis added). Commerce, therefore, determined Omax was primarily an auto producer based on its name, customers, and the statements of its Managing Director.

The name of the company, Omax Autos Limited, pretty much says it all. It communicates that the company is primarily involved in the automotive business. Similarly, all but one of Omax's 29 customers is in the automotive business. Admittedly, that one customer in the home furnishings business is the "global behemoth" Ikea. Since Hardware SV Submission, PD 98 at App. 1. And although that does count for something, a reasonable mind could conclude on this administrative record that Omax concentrates the bulk of its operations on the automotive sector and is therefore not a suitable surrogate for the general financial ratio calculations of a metal ironing board

manufacturer.  Accordingly, the court must sustain Commerce's decision to exclude the Omax financial statements.

## B. Brokerage and Handling

In the final results Commerce determined the World Bank's <u>Doing Business 2010: India</u> is "the best available source for valuing Foshan Shunde's brokerage and handling expenses."  <u>Final Results</u>; <u>see</u> <u>Decision Memorandum</u> at cmt. 3.  Commerce used the World Bank data to calculate Foshan Shunde and Since Hardware's brokerage and handling ("B&H") expenses based on their respective container sizes. <u>Id</u>.  Foshan Shunde challenged Commerce's reliance on the World Bank data and the specific B&H calculations.  Commerce requested a voluntary remand to correct Foshan Shunde's container weight and to address Foshan Shunde's requested letter of credit deduction.  The court granted Commerce's voluntary request for remand and further remanded the issue for Commerce to (1) prepare a clear and complete public summary of its calculations of Foshan Shunde's B&H expense; (2) explain why its chosen surrogate data source and calculation is reasonably the best choice by comparing the advantages and disadvantages of each; and (3) respond to Foshan Shunde's arguments with respect to Commerce adjusting Foshan Shunde's actual shipped weight and actual shipping mode.  <u>Since Hardware</u> at 8-9.

On remand Commerce affirmed its selection of the World Bank data and its B&H calculation.  <u>Remand Results</u> at 15-22, Attach. 1.  Commerce also detailed the mechanics of its calculation for public summary:

This details [Commerce's] calculation of brokerage and handling expense. In Doing Business India, total brokerage and handling expenses are listed as follows: [See Doing Business in India - Doing Business - The World Bank Group (Doing Business India—2010) at 37 and 84; see also HPI November 15, 2010 Case Brief at 17-18.]

| | |
|---|---|
| 1) Document Preparation: | $350 |
| 2) Customs Clearance and technical control | $120 |
| 3) Ports and Terminal Handling | $175 |
| Total charges | $645 |

Moreover, as noted in the Doing Business India—2010 study, the container size assumed in the study is for a 20 foot full container load. However, both Since Hardware and Foshan Shunde shipped in 40 foot containers.  Therefore, using the formulae set forth, we estimated the shipment weight that would be incurred in a 20 foot container as follows: [This calculation is also explained at HPI November 15, 2010 Case Brief at 17-18.]

D= (A*B)/C

E= $645/D

A represents the cubic capacity of a 20 foot container which is 33 cubic meters

B represents the weight of product shipped in 40 foot containers which is {  } kg of product

C represents the cubic capacity of a 40 foot container (the size in which both respondents shipped merchandise) which is 67.3.

D represents the estimated weight of product shipped in 20 foot containers

E represents the calculated, per kilogram amount for brokerage and handling.

In this case D yields an estimated weight of {   } kilograms for product shipped in a 20 foot container

D= 33*{  }/67.3= {  }.

Therefore, to derive the { } per unit brokerage and handling amount utilized in the Final Results, we divided the total brokerage and handling amount of $645 by the { } estimated weight of product shipped in 20 foot containers.

E=$645/{ }={ }

<u>Public Summary of Calculation</u>

This calculation can also be illustrated publicly through the use of hypothetical numbers.   In this hypothetical example, we continue to allocate the total pool of brokerage and handling expenses ($645) from <u>the Doing Business India—2010</u> study.  We assume that this respondent shipped in a 40 foot container.  We, thus adjust the calculated shipment weight for this hypothetical respondent to adjust for shipments in a 20 foot container instead of in a 40 foot container.  We also continue to assume the same cubic capacity for both the 20 foot and 40 foot containers that we utilized in the Final Results of this review.

In our hypothetical example, we assume that the respondent shipped 5000 kg of product in a 40 foot container.  In such an instance

A (the cubic capacity of a 20 foot container) would continue to equal 33 cubic meters.

B (the weight of product shipped in 40 foot container) would equal 5000 kilograms.

C (the cubic capacity of a 40 foot container) would continue to equal 67.3 cubic meters.

D represents the estimated weight of product shipped in 20 foot container which would be

D= 33*5000/67.3= 2,451.71

E represents the calculated, per kilogram amount for brokerage and handling which would equal $0.2631 or

E= $645/2451.71=.2631

<u>Remand Results</u> at Attach. 1.  Commerce further explained:

[W]e have determined that brokerage and handling expenses were properly calculated in the Final Results for the following reasons.   The Department's practice when selecting the best available information for valuing FOPs, in accordance with section 773(c)(1) of the Act, is to select surrogate values which are product-specific, representative of a broad-market average, publicly available, contemporaneous with the POR, and free of taxes and duties.   The Doing Business 2010: India data from the World Bank reflect the experience of a broad number of companies, are publicly available, specific to the costs in question, represent a broad market average, and are contemporaneous to the POR.

***

[T]he Department has utilized such World Bank data in a number of cases including Wooden Bedroom Furniture from the People's Republic of China, Stainless Steel Sinks from China, and Wooden Bedroom Furniture from the People's Republic of China, consistently finding the World Bank data to be a reliable and accurate source of surrogate value information. World Bank data represent a reputable source of information for valuing brokerage and handling because those data are prepared by an independent organization and are based upon a survey derived from a broad number of producers.   In contrast, the import data offered by Foshan Shunde were limited to two freight forwarders (Samsora[sic] and Hapang[sic] Lloyd).   While Foshan Shunde has argued that the import data of Samsora and Hapang[sic] Lloyd also relate somehow to exports, **the facts on the record of this proceeding do not substantiate the quantification of any such export experience**.   As previously noted, the business of exporting is fundamentally different than the business of importing and the data from these activities cannot be considered interchangeable.

Further, the data provided by Foshan Shunde to link brokerage and handling expenses to Foshan Shunde's specific business situation fail to substantiate its claims with regard to the expenses associated with the preparation of letters of credit.   As Petitioner has demonstrated, the World Bank data upon which the Department relied constituted $350 and are comprised of eight items: 1) bill of lading, 2) certificate of origin, 3) commercial invoice, 4) custom's export declaration, 5) inspection report, 6) packing list, 7) technical standard/health certificate, and 8) terminal handling receipts.   Nowhere in this schedule of eight items are letter of credit expenses mentioned.   More to the point, . . .**Foshan Shunde has claimed a constructed letter of credit cost of $390 which exceeds the total amount of brokerage and handling expenses calculated by the World Bank.   Applying the $390 letter of credit expense, to the $350 of charges set forth in the Doing Business report would thus result**

**in the nonsensical calculation of a negative expense amount for Foshan Shunde's brokerage and handling expenses.** . . . .

Foshan Shunde's fails to substantiate its assertions that as a "rational producer" it would never incur expenses as high as those enumerated in the <u>Doing Business</u> report or that distance from seaport is a determining factor in brokerage and handling expenses.  As Petitioner has noted, **because "inland transportation and handling" are calculated elsewhere in NV calculations, distance from a seaport is an irrelevant factor for purposes of calculating brokerage and handling expenses. These expenses are by definition incurred at the port of export.**

***

. . . **While Foshan Shunde asserts that exporters close to a seaport incur lower brokerage and handling costs than do inland manufacturers, there is no evidence on the record that permits the Department to quantify that suggested difference.**  Similarly, there is no information on the record of this proceeding that would permit the Department to tailor any publicly-available surrogate value data to the specific business situation experienced by Foshan Shunde or to remove elements of brokerage and handling expense which Foshan Shunde claims not to have incurred.  . . .  Foshan Shunde's claim that it does not incur letter of credit expenses invites an inquiry that is beyond the scope of the issue here.  The relevant question is whether the World Bank data are a reliable source for general brokerage and handling expenses, not whether the World Bank report reflects Foshan Shunde's line-by-line experience.  . . .  **Without knowing the exact breakdown of the data included in the World Bank report, the Department can no more deduct a letter of credit expense than add extra expenses which Foshan Shunde incurred but are not reflected by the World Bank data.**  In other words, the averaged data in the World Bank report is a reasonable surrogate value because a line-by-line analysis is simply not possible.  . . . .

Foshan Shunde has also challenged the Department's adjustment from the 40 foot container size in which it shipped to the 20 foot container sizes that are reflected in the <u>Doing Business 2010: India</u> data.  This issue was also reviewed by the Court in <u>Dongguan Sunrise</u>.  . . .  In sustaining the Department's conversion from a 40 foot to a 20 foot container size, the Court rejected Fairmont's argument indicating:

This argument fails because Fairmont has not presented evidence that brokerage costs are based on value, not

> volume, and do not increase proportionately with the number
> of cubic feet.
>
> The methodology employed in this review is consistent with that
> employed in <u>Dongguan Sunrise</u>.    Foshan Shunde has failed to
> demonstrate which, if any, of the costs included within the <u>Doing Business</u>
> <u>2010: India</u> data do not increase proportionately with volume.
> Accordingly, . . . we continue to maintain that our adjustment for container
> size is supported by record evidence in this proceeding.

<u>Remand Results</u> at 17-21, 38-40 (citations omitted) (emphasis added).

Foshan Shunde first argues that Commerce's B&H calculations are
unreasonable because Commerce should not have relied on the World Bank data but
should have instead used the data from Indian freight forwarders: Samsara and Hapag-
Lloyd.  FS Remand Br. at 11-20.  Foshan Shunde challenges the World Bank data as
not reflecting the experience of any Indian producers at all, but being based on a survey
completed by "[l]ocal freight forwarders, shipping lines, customs brokers, port officials,
and banks."  <u>Id.</u> at 13 (citing Foshan Shunde SV Submission for Final Results, PD 96 at
Ex. 6).  Foshan Shunde adds that Commerce is generally reluctant to use the results of
a survey as source documentation when "none of the actual responses or data collected
from these questionnaires were provided in the report" and that therefore, Commerce
"had no way to evaluate whether the information collected in the questionnaire
responses was complete or properly analyzed, much less whether the responses can
be considered representative . . . ."  <u>Id.</u> at 13 (quoting <u>Fresh Garlic from China</u>, 77 Fed.
Reg. 34,346 (Dep't of Commerce June 11, 2012) (final results admin. review)).  The
court disagrees.

Commerce explained that its practice when selecting the best available information for valuing factors of production, in accordance with 19 U.S.C. § 1677b(c)(1), is to "select surrogate values which are product-specific, representative of a broad-market average, publicly available, contemporaneous . . . and free of taxes and duties."  Remand Results at 17-18 (citing Certain Polyester Staple Fiber from the People's Republic of China, 75 Fed. Reg. 1336 (Dep't of Commerce Jan. 11, 2010) (final results admin. review).  Accordingly, Commerce calculated Foshan Shunde's B&H costs using the World Bank's Doing Business 2010: India which "reflect[s] the experience of a broad number of companies, [is] publicly available, specific to the costs in question, represent a broad market average, and are contemporaneous."  Remand Results at 17-18.  In contrast, Foshan Shunde's data are limited to two sources, Samsara and Hapag-Lloyd.  Commerce explained that while the World Bank data largely satisfy Commerce's surrogate value criteria, Foshan Shunde's two sources are deficient in several respects.  See id. at 18-19.  First, they fail to represent a broad market average because they are from only two companies.  Id. at 18.  Second, the experience of two freight forwarders is not specific to the expenses in question because the expenses reported in these data sources represent import expenses—not export expenses.  Id. at 19 ("[T]here is no documentation on the record of this proceeding to suggest that the costs for importing merchandise parallel the costs that are related to exporting merchandise.").  Commerce further explained that "the business of exporting is fundamentally different than the business of importing and the data from these activities cannot be considered interchangeable."  Id. at 39.  In response, Foshan

Shunde contends that Commerce's finding "is simply incorrect" and that it submitted "prices for all port activities – for both importers and exporters."  FS Remand Br. at 16.  However, the Samsara and Hapag-Lloyd data that Foshan Shunde submitted are both labeled as import data.  See Foshan Shunde SV Submission for Prelim. Results, PD 77 at Ex. 2.  Further, when arguing that it submitted export data, Foshan Shunde cites to its submission of the Indian port schedules, Foshan Shunde SV Submission for Prelim. Results, PD 77 Ex. 1, and not the Samsara and Hapag-Lloyd data, Foshan Shunde SV Submission for Prelim. Results, PD 77 Ex. 2.  Therefore, Commerce reasonably concluded that the Samsara and Hapag-Lloyd data reflect only import data.  See Foshan Shunde SV Submission for Prelim. Results, PD 77 at Ex. 2.

Additionally, although Foshan Shunde claims that consistent with Commerce practice, Commerce "must reject the World Bank Doing Business Report as unrepresentative, unreliable, and unverifiable," FS Remand Br. at 13, Commerce reasonably found the World Bank data to be a "reliable and accurate source."  Remand Results at 38.  Commerce explained that the "World Bank data represent a reputable source of information for valuing brokerage and handling because those data are prepared by an independent organization and are based upon a survey derived from a broad number of producers."  Id. at 38-39.  Commerce has also previously relied on the World Bank data to calculate surrogate B&H values.  See e.g., Wooden Bedroom Furniture from the People's Republic of China, 76 Fed. Reg. 9,747 (Dep't of Commerce Feb. 22, 2011) (new shipper review final results); Drawn Stainless Steel Sinks from the People's Republic of China, 78 Fed. Reg. 13,019 (Dep't of Commerce Feb. 26, 2013)

(final results admin. review); Wooden Bedroom Furniture from the People's Republic of China, 75 Fed. Reg. 50,992 (Dep't of Commerce Aug. 18, 2010) (final results admin. review); see also Dongguan Sunrise Furniture Co. v. United States, 36 CIT ___, ___, 865 F. Supp. 2d 1216, 1246 (2012) (affirming Commerce's reliance on the World Bank data and noting that "Commerce has consistently found the World Bank to be a reliable source for data").  Therefore, Commerce reasonably relied on the World Bank data.

Foshan Shunde next argues that Commerce should have altered the World Bank data to reflect Foshan Shunde's actual expenses.  FS Remand Br. at 12.  First, Foshan Shunde argues that Commerce should remove a specific expense from the aggregate data, specifically, the expense for preparing a letter of credit.  Id. at 17.  Foshan Shunde contends that because it did not incur a letter of credit expense, Commerce should adjust the B&H by deducting amounts for letter of credit expenses.  Id. at 17.  Foshan Shunde explains that "the World Bank data includes costs for procuring an export letter of credit," id. at 17, and that "the L/C costs are embedded in the "documents required to export and import" and greatly inflate the document preparation costs."  FS 56.2 Br. at Ex. 1, 31.  Foshan Shunde lists the price of an export letter of credit as $390.  FS Remand Br. at 17 (citing FS' Br. 56.2 at 26).  Commerce, however, responds that it will not adjust the B&H because the listed items composing the B&H do not include a letter of credit expense.  Remand Results at 39 ("Nowhere in this schedule of eight items are letter of credit expenses mentioned.").  Moreover, Defendant argues that Foshan Shunde's $390 letter of credit cost "exceeds [$350,] the total amount of [the document preparation costs of the] brokerage and handling expenses calculated by the World

Bank.  Applying the $390 letter of credit expense, to the $350 . . . charges . . . would result in the nonsensical calculation of a negative expense."  Id. at 39 (citations omitted) (original emphasis).

The B&H costs from the Word Bank data are composed of three categories of expenses: (1) document preparation; (2) customs clearance and technical control; and (3) ports and terminal handling.  Id. at Attach. 1.  The document preparation fee is composed of eight items: (1) bill of lading; (2) certificate of origin; (3) commercial invoice; (4) custom's export declaration; (5) inspection report; (6) packing list; (7) technical standard/health certificate; and (8) terminal handling receipts.  Id. at 39.  Letters of credit are not included in the eight listed expenses for document preparation.  Even if the letter of credit expenses are embedded, as Foshan Shunde argues, the court agrees that, "without knowing the exact breakdown of the data included in the World Bank Report, [Commerce] can no more deduct a letter of credit expense than add extra expenses which Foshan Shunde incurred but are not reflected by the World Bank data."  Id. at 19-20.  Therefore, Commerce's refusal to adjust the B&H costs for possible letter of credit expenses was reasonable.

Next, Foshan Shunde argues that Commerce should have adjusted its B&H calculations to reflect Foshan Shunde's proximity to China's seaports.  Foshan Shunde argues that "proximity to a major seaport is a key factor in the World Bank's determination of the cost of trading across borders in India" and that companies near ports bear lower B&H expenses.  FS 56.2 Br. at Ex. 1, 28; FS Remand Br. at 16.  Commerce responds that "because 'inland transportation and handling' are calculated

elsewhere in NV calculations, distance from a seaport is an irrelevant factor for purposes of calculating brokerage and handling expenses.  These expenses are by definition incurred at the port of export."  <u>Remand Results</u> at 40.  Commerce further adds that "[w]hile Foshan Shunde asserts that exporters close to a seaport incur lower brokerage and handling costs than do inland manufacturers, there is no evidence on the record that permits [Commerce] to quantify that suggested difference."  <u>Id.</u> at 19.  The court does not believe this conclusion is reasonable on this administrative record.

Foshan Shunde placed on the administrative record the World Bank's <u>Doing Business Subnational Report</u> that includes the specific B&H costs for Indian seaports: Chennai, Kochi, Kolkata, and Mumbai.  Foshan Shunde SV Submission for Final Results, PD 96 at Ex. 4.  The data that Commerce relied on, the World Bank's <u>Doing Business in India: 2010</u>, is composed of the B&H costs of 17 Indian cities/regions including the four above mentioned port cities.  <u>Id.</u> at Ex. 3-4.  Four of the 17 cities are seaports, and the remaining 13 are inland.  <u>Id.</u> at Ex. 4.  The <u>Doing Business Subnational Report</u> contains the following categories of expenses for each seaport: (1) document preparation; (2) customs clearance and technical control; (3) ports and terminal handling; and (4) inland transportation and handling.  <u>Id.</u>  Commerce explained that it did not include inland transportation and handling in its B&H calculations.  <u>Remand Results</u> at 40.  Commerce instead calculated B&H from the other three categories of costs: (1) document preparation; (2) customs clearance and technical control; and (3) ports and terminal handling.  <u>Id.</u> at Attach. 1.  Therefore, in arguing the proper B&H calculation for each seaport, Foshan Shunde also omitted inland

transportation and handling costs from the <u>Business Subnational Report</u> data.  FS 56.2 Br. at 28.   The <u>Business Subnational Report</u>, excluding inland transportation and handling fees, provides the following B&H costs for the four seaports: Chennai: $439; Kochi: $375; Kolkata: $462; and Mumbai $645.   Foshan Shunde SV Submission for Final Results, PD 96 at Ex. 4.; <u>see also</u> <u>id.</u>   The average B&H costs for the four seaports are $480.  In contrast, based on the aggregate data of all 17 cities, Commerce calculated $645 in B&H costs.  <u>Remand Results</u> at Attach. 1.  Therefore, even excluding inland transportation costs, there is a $165 difference between the combined data for all 17 Indian cities and the data from the seaports.   This evidence directly contradicts Commerce's conclusion that "distance from a seaport is an irrelevant factor" and that there is no evidence to "quantify that suggested difference."  <u>Id.</u> at 19, 40.  Further, the court agrees with Foshan Shunde that Commerce "offered no explanation why the World Bank report including export costs from 17 Indian cities, most of which lie far inland, was a more appropriate data set than the regional reports of four Indian cities geographically located near major ports, when Foshan Shunde itself is located near major Chinese ports."   FS 56.2 Br. at 26.   Commerce's determination appears unreasonable.  The court must therefore remand this issue to Commerce to consider the World Bank data from the seaports or to provide a reasonable explanation as to why that is not appropriate.

Finally, Foshan Shunde argues that Commerce's adjustment of the World Bank data from 20-foot to 40-foot containers is unreasonable because B&H costs do not increase proportionally from 20-foot to 40-foot containers.  FS Remand Br. at 19-20.

Foshan Shunde contends that the per-kilogram B&H costs of a 40-foot container is lower than that of a 20-foot container.  Id.  Commerce calculated the B&H costs by first determining the per-kilogram B&H costs of a 20-foot container, and then applied that value to the weight of a 40-foot container.  This type of calculation assumes that B&H costs increase proportionally from 20-foot to 40-foot containers.  From this calculation, Commerce determined B&H costs to be $645.    Remand Results at Attach. 1. Defendant and HPI respond to Foshan Shunde's argument, explaining that Commerce "merely converted the data, such that the World Bank data would reflect the ways in which Foshan Shunde actually ships its goods" and that, "Commerce made a straightforward mathematical adjustment from the 40-foot container size in which it shipped to the 20-foot container size that are reflected in the World Bank data." Defendant's Resp. to Plaintiffs' Comm. Concerning Remand Results, ECF No. 100 at 19-20 ("Def. Remand Br."); see also Reply of HPI to Comm. Concerning Remand Results, ECF No. 101 at 19 ("HPI Remand Br.").  Defendant also argues that this same issue was addressed in Dongguan Sunrise v. United States, 36 CIT ___, ___, 865 F. Supp. 2d 1216, 1247 (2012), in which the court held Commerce's conversion from a 20-foot to a 40-foot container reasonable.  Def. Remand Br. at 20.  HPI also relies on Utility Scale Wind Towers from the People's Republic of China, 77 Fed. Reg. 75,992 (Dep't of Commerce Dec. 26, 2012) (final determ.), in arguing that total B&H costs increase proportionally with container capacity.  HPI Remand Br. at 19.  On remand, Commerce explained that "Foshan Shunde has failed to demonstrate which, if any, of the costs included within the Doing Business 2010: India data do not increase proportionately with

[container size]." <u>Remand Results</u> at 21. Defendant and HPI, therefore, argue that Commerce's conversion of the data was reasonable (supported by substantial evidence).

In <u>Dongguan Sunrise</u> the court sustained Commerce's adjustment of the World Bank data from a 20-foot to a 40-foot container "because [Respondent] ha[d] not presented evidence that brokerage costs are based on value, not volume, and do not increase proportionally with the number of cubic feet." <u>Dongguan Sunrise</u>, 36 CIT at ___, 865 F. Supp. 2d at 1247. Similarly, in <u>Utility Scale Wind Towers from the People's Republic of China</u>, Commerce stated, "<u>absent record evidence to the contrary</u>, total brokerage and handling costs increase proportionally with a container's capacity and, therefore, per-unit brokerage and handling rates do not change as a container's capacity increases." <u>Utility Scale Wind Towers from the People's Republic of China</u>, 77 Fed. Reg. 75,992, 75,997 (Dep't of Commerce Dec. 26, 2012) (final determ.) (emphasis added). If B&H costs increased proportionally from 20-foot to 40-foot containers, as Commerce calculated, then there would be a 100% increase in B&H costs from a 20-foot to a 40-foot container. Foshan Shunde, however, points to evidence in the record that shows only a 30-50% increase in costs from 20-foot to 40-foot containers. Foshan Shunde SV Submission for Prelim., PD 77, Ex. 1 at 3-6, 14-16, 37, 64-65, Ex. 2; <u>see also</u> FS 56.2 Br. at 33. Therefore, Foshan Shunde has demonstrated that B&H costs do <u>not</u> increase proportionally from 20-foot to 40-foot containers. Accordingly, Commerce unreasonably concluded that, "Foshan Shunde has failed to demonstrate, which if any, of the costs . . . do not increase proportionately with volume." <u>Remand</u>

Results at 21.   The court remands this issue to Commerce to consider Foshan

Shunde's evidence regarding B&H costs in 20-foot versus 40-foot containers.

### C. Cotton Fabric Surrogate Valuation

In Since Hardware the court granted Commerce's voluntary remand request to

reconsider Since Hardware's cotton fabric weight and recalculate the conversion factor.

Since Hardware at 2.   On remand, Commerce changed the conversion factor from 5.0

to 7.5 and explained:

> Since Hardware has demonstrated that the weight of its cotton fabric was
> between 100 grams and 200 grams per square meter.   The precise
> conversion factor for Since Hardware's cotton inputs would therefore
> range between 5 and 10.   Therefore, based upon the information on
> record, the Department has based its determination on a reasonable
> inference that the conversion factor is 7.5.

Remand Redetermination at 23.   In challenging the cotton fabric conversion factor,

Since Hardware presents a hollow argument.   Since Hardware's entire argument

consists of the following: "[t]his Court should find that Commerce should use the record

information verified for Since Hardware and apply the 5.49 conversion factor instead of

the 7.5 as it is more specific to Since Hardware Draft Remand Comments at 2-6[sic]."

SH Br. at 20.   Missing is any effort to develop an argument as to how the 5.49

conversion factor is "more specific to Since Hardware" and to identify standards against

which the court can evaluate the reasonableness of Commerce's cotton fabric valuation.

Id.   Since Hardware's "argument" is all the more difficult to countenance because the

Scheduling Order specifically cautioned against just such a submission:

> Please be advised that the court will not permit the plaintiff to shift to the
> court and the other parties the burden of establishing the ossature of
> plaintiff's arguments against the standard of review the court applies to

> resolve them.    Instead, the court will summarily sustain Commerce's
> action.

Scheduling Order at 5, ECF No. 36.  Rule 56.2(c)(2) requires that briefs "must include the authorities relied on and the conclusions of law deemed warranted by the authorities."  USCIT R. 56.2(c)(2).  As Since Hardware has failed to satisfy this basic requirement, and abide by the express instructions of the Scheduling Order, the court deems this issue waived and sustains Commerce's cotton fabric surrogate valuation. See MTZ Polyfilms, Ltd. v. United States, 33 CIT ___, ___, 659 F. Supp. 2d 1303, 1308-09 (2009); Fujian Lianfu Forestry Co. v. United States, 33 CIT ___, ___, 638 F. Supp. 2d 1325, 1350 (2009); United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.") (citations omitted).

### D. Labor Wage Rate Surrogate Valuation

In the final results Commerce calculated the surrogate labor wage rate using data from the International Standard Classification of all Economic Activities ("ISIC") Revision 3 rather than ISIC Revision 2.  Final Results; see Decision Memorandum at 16.  The court in Since Hardware remanded the issue to have Commerce conform its results with the prior review, Home Prods., 36 CIT ___, ___, 837 F. Supp. 2d 1294, 1296-97, and to include Indian data under ISIC Revision 2, as well as any other appropriate country in that data set.  Since Hardware at 9-11.  The court rejected Since

Hardware and Foshan Shunde's argument that Commerce must use data from India because "the statute does not mandate Commerce must, as a matter of law, use Indian data alone." Since Hardware at 10. The court also deemed waived any argument by Since Hardware and Foshan Shunde that, as a factual matter, India alone was both economically comparable to China and a significant producer of comparable merchandise, because neither party identified even one country included in Commerce's analysis that failed either standard, leaving that work to the court or the other interested parties. Id. Consequently, the court did not "require Defendant or HPI to expend any more energy on this issue" other than for Commerce to conform its decision to its Remand Redetermination from the prior administrative review. Id. at 11.

On remand Commerce followed the court's instructions and recalculated the labor wage rate "rely[ing] on labor data reported by countries either under the International Standard Industrial Classification (ISIC) Revision 3, or, as discussed below, ISIC Revision 2," including "data from India and Nicaragua." Remand Results at 22-22. Since Hardware again argues that Commerce should have selected India alone to calculate the surrogate wage rate. SH Br. at 19-20. The court previously rejected this argument in Since Hardware, and Commerce's labor wage rate surrogate valuation is therefore sustained. See Since Hardware at 10-11; see also Home Prods. Int'l, Inc. v. United States, 36 CIT ___, ___, 810 F. Supp. 2d 1373, 1380 (2012); opinion after remand, Home Prods. Int'l, Inc. v. United States, 36 CIT ___, ___, 837 F. Supp. 2d 1294, 1297 (2012); opinion after remand, Home Prods. Int'l, Inc. v. United States, 36

CIT ___, 853 F. Supp. 2d 1257 (2012), aff'd, Home Prods. Int'l, Inc. v. United States, 501 Fed. Appx. 981 (Fed. Cir. Apr. 11, 2013).

### III. Conclusion

Accordingly, it is hereby

**ORDERED** that Commerce's financial statement selection is remanded to reconsider the exclusion of the Maximaa financial statements; it is further

**ORDERED** that Commerce's brokerage and handling calculations are remanded for Commerce to reconsider its treatment of container sizes and proximity to seaports; it is further

**ORDERED** that Commerce's labor wage rate surrogate valuation is sustained; it is further

**ORDERED** that Commerce's cotton fabric surrogate valuation is sustained; it is further

**ORDERED** that Commerce shall file its remand results on or before July 30, 2013; and it is further

**ORDERED** that, if applicable, the parties shall file a proposed scheduling order with page limits for comments on the remand results no later than seven days after Commerce files its remand results with the court.

_____/s/ Leo M. Gordon_____
Judge Leo M. Gordon

Dated:     May 30, 2013
           New York, New York